UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| GREAT AMERICAN E & S INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NUMBER: 1:17 CV 00403 |
| | ) | |
| COUPLED PRODUCTS, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

After Defendant, Coupled Products, LLC's ("Coupled") tenant abandoned its electroplating operations and left Coupled with a hazardous waste mess on its property, Coupled received a notice of violation ("NOV") and a proposed agreed order ("PAO") from the Indiana Department of Environmental Management ("IDEM") demanding remediation. Coupled then sought coverage under various general liability policies issued to it by Plaintiff, Great American E & S Insurance Company's ("Great American") over the course of a five-year period. Great American agreed to defend the claims against Coupled under a reservation of rights but, in response to the coverage request, Great American filed the instant action seeking a declaration that it owes no coverage obligations to Coupled under any of the policies it issued between 2012 – 2017.

Presently before the Court is Great American's Motion for Summary Judgment [DE 12] filed on February 5, 2018. Defendant, Coupled responded on April 2, 2018 to which Great American replied on April 16, 2018. For the following reasons, the Plaintiff's Motion for Summary Judgment is DENIED in part and TAKEN UNDER ADVISEMENT in part. The parties

shall submit additional briefing or a Renewed Motion for Summary Judgment in accordance with the directions in this Opinion and Order.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. Mindful of these standards, the Court turns now to the facts of the case.

## FACTUAL BACKGROUND

The underlying facts of this action are largely undisputed and are construed as such throughout this Opinion and Order unless otherwise indicated.

**A. The Policies**

Coupled purchased a myriad of insurance policies, including products/completed operations, general liability, and excess policies from Great American between 2012 and 2017 ("the Policies"). The products/complete operations and general liability policies have nearly identical insuring language. The products/complete operations policies provide as follows:

> [Great American] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damages' within the 'products completed operations hazard' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.

(Doc. 13-2, at 11; Doc. 13-3 at 13; Doc 13-4 at 12). With respect to the general liability policies the first sentence of the insuring clause provides, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. 13- …). The Policies further provide that coverage exists only if the "bodily injury" and "property damage" are caused by an "occurrence." (*Id.*). An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 13-2, at 21; Doc. 13-3 at 23; Doc 13-4 at 29). "Property damage" means:

> a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it…

*(Id.).*

The Policies also contain numerous exclusions.[1] Relevant for purposes of the current Motion is the exclusion of coverage for "damages" to "property [the insured] own[s], rent[s] or occup[ies], including any costs or expenses incurred by [the insured] or any other person or entity, for repair, replacement, restoration or maintenance of such property, including prevention of injury to a person or damage to another's property" (hereinafter, "the Owned-Property Exclusion").[2]

On July 5, 2017, Coupled tendered the NOV and PAO it received from IDEM to Great American for review. In a letter dated September 19, 2017. Great American, under a reservation of rights for the general liability policies, agreed to defend Coupled against the NOV and PAO.[3]

**B. <u>Site Operations</u>**

From 2007 through the present, Coupled is the owner of the real property located at 2651 S. 600 E. in Columbia City, Indiana ("the Site"). Until August 28, 2015, Coupled also owned and operated the electroplating lines within the building located at the Site. However, after August 28, 2015, Coupled sold the electroplating lines and operations to a third party, HuthOne, LLC ("Huth One"). As part of that sale, HuthOne agreed to pay for all costs associated with plating, and was required to "obtain and maintain all permits, licenses and other approvals necessary for the performance of [HuthOne's] obligations under this Agreement." Affidavit of Tina Johnson at ¶10 (hereafter "Johnson Aff. at ____"). Along with the purchase of the electroplating operations,

---

[1] In its opening brief, Great American asserts that it is not relying on any policy exclusions in the current motion. However, in its reply brief, Great American mentions the owned-property exclusion in a footnote and argues that this exclusion confirms that the Policies provide third-party insurance coverage rather than first-party coverage. This raises some issues left unaddressed by the parties in the current briefing as indicated at the end of this Opinion and Order.

[2] With respect to the excess policy, which is not at issue in the current Motion, the insuring clause provides that Great American will pay amounts over the policy limits of the underlying policies, but only if the underlying policies provide coverage. (Doc. 13-8 at 5-10).

[3] Great American has not disputed its obligation to defend Coupled against the NOV and PAO. Rather, it brings suit presently to declare its coverage obligation given the facts of the alleged violations.

HuthOne's president, Larry Huth, leased from Coupled the portion of the building at the Site used for electroplating. *Id.* at ¶11.

One year later, on September 1, 2016, HuthOne ceased its electroplating operations and abandoned its electroplating chemicals (including products and waste) at the Site. It is these chemicals (including products and waste) that are the subject of the NOV and PAO issued to Coupled.

**C. <u>IDEM's Involvement</u>**

On June 27, 2017 IDEM issued the NOV, alleging that Coupled and HuthOne, LLC (together "the Respondents") were in violation of various environmental statutes and regulations by virtue of having improperly handled, stored and marked hazardous waste materials at the Site. The NOV recites that Coupled formerly conducted electroplating activities at the Site, that HuthOne purchased the plating operation and all chemicals on August 28, 2015, and that HuthOne ceased operations at the Site on September 1, 2016. (NOV at ¶3). According to the NOV, after the electroplating operations ceased at the Site, various products and materials used in those operations remained in manufacturing process units for more than ninety (90) days, and therefore, those products constitute hazardous wastes improperly stored by Respondents without the requisite permits. (NOV, at ¶4).

The NOV cites the Respondents for the following violations of the Resource Conservation and Recovery Act ("RCRA") regulations governing the storage, handling and permitting of hazardous waste facilities:

- Failing to make hazardous waste determinations as to numerous plating tanks, floor trenches, totes, containers, wastewater treatment tanks and in other areas of the facility (NOV at ¶6);

- Storing hazardous waste, such as plating sludge and materials remaining in process units, on site for greater than ninety (90) days without complying with certain specified statutes and regulations (NOV at ¶7);

- Storing hazardous waste, such as plating sludge and materials remaining in process units, on site for greater than ninety (90) days without permit in violation of certain specified statutes and regulations. (NOV at ¶8);

- Operating a hazardous waste facility without obtaining a permit from the Commissioner of IDEM for the treatment, storage and disposal of any hazardous waste. (NOV at ¶9);

- Failing to notify IDEM of its hazardous waste activities and allowing hazardous waste to remain in process units after manufacturing operations had ceased for more than ninety (90) days. (NOV at ¶10);

- Accumulating and storing hazardous waste materials without keeping same closed or properly/clearly marked, as well as without a permit. (NOV at ¶¶s 11-13); and

- Failing to properly manage spills in the electroplating area to minimize the possibility of a fire, explosion or any release of hazardous waste or hazardous waste constituents into the air, soil or surface water which could threaten human health or the environment. (NOV at ¶14).

In conjunction with the NOV, IDEM provided the Respondents with a PAO. The PAO is described as a qualified settlement which, if accepted, the Respondents would agree to comply with the statutes and regulations that form the basis of the regulatory violations alleged in the NOV and to submit a hazardous waste closure plan for the Site, subject to IDEM approval. Specifically,

the PAO asks the Respondents to take the following measures to comply with applicable RCRA regulations:

- Submit waste determination documentation for the hazardous waste material observed at the Site, including any lab analytical results, disposal records and disposition of any unused chemicals. (PAO, at ¶3);
- Ensure all containers holding hazardous waste are closed during storage, except when necessary to add or remove waste. (PAO, at ¶4);
- Ensure all hazardous waste containers are clearly dated. (PAO, at ¶5);
- Ensure all hazardous waste containers and tanks are clearly marked "Hazardous Waste." (PAO, at ¶6);
- Submit hazardous waste manifests, (PAO,at ¶7); and
- Submit a hazardous waste closure plan for the warehouse and wastewater treatment room where containers of hazardous waste are stored and for the plating room, subject to IDEM approval. (PAO, at ¶8).

**D. HuthOne, LLC**

As noted above, Coupled was not the owner or operator of the plating business at the time of the alleged violations. Rather, Coupled was the property owner and "landlord" to HuthOne. Since being notified by IDEM of the NOV, Coupled has been unable to locate or contact HuthOne or its representatives. In the interim, Coupled has lost use of an entire section of the building at the Site. (Johnson Aff. ¶16). Coupled filed suit in Whitley Superior Court and has secured a default judgment against HuthOne. That judgment requires specific performance by HuthOne to "comply with the October 17, 2016 and October 18, 2016, letters from IDEM and Paragraph 14 of the Lease," and to "pay all costs associated with the cleanup and removal of plating and waste

treatment at the Coupled Products facility." (Johnson Aff. ¶18). In the interim, Coupled is required to remove the hazardous waste abandoned by HuthOne and perform the tasks set forth in the PAO.

## DISCUSSION

This case presents engaging questions as to whether an order to remediate hazardous waste created by and abandoned by a tenant constitutes "damages" to the lessor/owner of the property under general liability insurance policies. Great American asserts it does not as the terms of its Policies only obligate it to pay damages because of "property damage" caused by an "occurrence." In addition, Great American argues that as a third-party liability insurer, it only has coverage obligations for "damages" Coupled causes to the property of others, not for Coupled's own property. Coupled, in turn, asserts that the order to remediate and contain the existing hazardous waste situation created by its third-party tenant constitutes "damages" caused by an "occurrence" under the Policies and, additionally, that it suffered a "loss of use" of its property which qualifies as "damages" under the definitions in the Policies.

The Court begins its analysis at the source of the dispute – the Policies themselves. Insurance policies are governed by the same rules of construction as other contracts. *Briles v. Wausau Ins. Companies*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006). As with other contracts, the interpretation of an insurance policy is a question of law. *Id.* When interpreting an insurance policy, the goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. *Id.* The Court construes the insurance policy as a whole and considers all of the provisions of the contract and not just the individual words, phrases or paragraphs. *Id.* If the language is clear and unambiguous, the Court gives the language its plain and ordinary meaning. *Id.* An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. *Id.* However, an ambiguity does not exist merely because the parties

proffer differing interpretations of the policy language. *Id.* The Court must accept an interpretation of the contract language that harmonizes the provisions, rather than one that supports conflicting versions of the provisions. *Id.* Additionally, the power to interpret contracts does not extend to changing their terms and the Court will not give insurance policies an unreasonable construction to provide additional coverage. *Id.*

As set out above, the Insuring Agreement for the Policies provide for coverage for "property damage" caused by an "occurrence" that the insured becomes legally obligated to pay. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" includes physical injury to tangible property as well as "loss of use" of the property. Fortunately for the Court, much of the leg work as to when provisions such as the ones at issue here afford coverage have been settled in Indiana for some time and briefed at length by the parties.

Great American contends that it has no coverage obligation under these definitions since there has been no "occurrence" and no "damages" to a third party to which its Policies would apply. Rather, Great American suggests that the costs Coupled will incur are nothing more than "regulatory compliance costs that any hazardous was generator or facility owner faces as a cost of doing business, in order to prevent *future* harm to the environment. As such, it contends that such regulatory compliance costs do not constitute covered "damages" within the meaning of the Policies.

In support of this position, Great America points to the Indiana Supreme Court's holding in *Cinergy Corp. v. Associated Elec. And Gas Ins. Servs., Ltd,* 865 N.E.2d. 571, 583 (Ind. 2007) ("Cinergy I"). In that case, a number of power companies (known collectively as Cinergy) sought insurance coverage for an underlying federal lawsuit alleging that power companies had failed to

install pollution control technology to bring their power plants into compliance with the Clean Air Act ("the CAA"). *Id.* at 578. Among other things, the underlying lawsuit sought an order enjoining Cinergy from operating the power plants in violation of applicable regulatory requirements, ordering Cinergy to remedy its past violations by installing technology to meet the emissions requirements of the CAA, and requiring Cinergy to apply for permits in conformity with the requirements of the CAA. *Id.*

The Cinergy power companies argued that they were entitled to coverage under various liability policies because the costs they would incur to bring the plants into compliance with the CAA regulations were covered "damages" within the meaning of the insurance policies. *Id.* at 578-579. In contrast, the insurer argued that the underlying lawsuit did not assert any claim for "bodily injury" or "property damage" but, rather, only sought to compel Cinergy to install modern pollution control equipment to bring the power plants into compliance with the CAA and thereby reduce emissions of pollutants in the future. *Id.*

The Indiana Supreme Court squarely rejected Cinergy's arguments that the underlying lawsuit asserted claims for "damages" covered by the insurance policies:

> [n]otwithstanding the federal lawsuit's various references to seeking relief that would 'remedy' past violations and harm to the public health, the power companies acknowledge that the injunctive remedy sought by the federal lawsuit is to 'force Cinergy to install equipment to contain any further excess emissions and allow the environment to recover.' The federal lawsuit is directed at preventing future public harm, not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions.

*Id.* at 582.

In reaching this conclusion, the Court found that there was no dispute between the parties as to the thrust of the underlying lawsuit. Indeed, the parties agreed that the crux of the underlying suit was to require the power companies to install equipment that would reduce future air emissions

and prevent future environmental harm. *Id.* As a result, the Indiana Supreme Court resolved the coverage issue in favor of the insurer since, in this instance, the equipment installation costs were not "caused by" an "occurrence" as that term was defined in the policies:

> …the installation costs for equipment to prevent future emissions is not caused by the happening of an accident, event or exposure to conditions but rather results from the prevention of such an occurrence. We cannot read the policies' requirement that covered damages result from the happening of an occurrence to mean that coverage extends to damages that result from the prevention of an occurrence.

*Cinergy I*, 856 N.E.2d at 582. Rather, the Indiana Supreme Court concluded that no policy ambiguity existed that would permit a reading of occurrence "reasonably to be understood to allow coverage for damages in the form of installation costs for government mandated equipment intended to reduce future emissions of pollutants and to prevent environmental harm." *Id.*[4] Based on this holding, Great American asserts that it has no coverage obligation to Coupled for its remediation costs.

In sharp contrast to Great American's position, Coupled distinguishes the facts of the present case from *Cinergy I*. First, Coupled points out that it is being ordered to remediate an *existing* hazardous waste situation -- not install equipment or bring the facility into specific compliance to prevent future violations and thus, *Cinergy I* is inapposite to the facts here. Second, Coupled argues that the *Cinergy I* decision ignores the interplay of a third-party lessor creating the environmental hazard such as is the case here with HuthOne, LLC. Rather, Coupled argues that

[4] Since this holding in *Cinergy I*, Indiana courts have consistently applied this precedent to deny coverage for insureds faced with an order to bring its operations into compliance with statutes and regulations so as to avoid future harm to the environment. *See e.g. City of Evansville v. United States Fid. & Guar. Co.,* 965 N.E.2d 92, 103 (Ind. Ct. App. 2012) ("The holding of *Cinergy I* is that prevention of future environmental harm, rather than remediation of past contamination, is not an 'occurrence' under insurance policies, and the policies at issue here contain similar provisions."); *Newsome Mfg v. Trasncontinental Ins. Co.*, 871 N.E.2d 396, 403 (Ind. Ct. App. 2007) ("This equipment was intended to reduce future emissions of pollutants, and therefore, under the *Cinergy* precedent, its mandated installation is not a response to the happening of an 'occurrence.'").

the Policies clearly apply to situations where the insured is damaged in the form of "loss of use" of its property due to the actions of a third-party. (Resp. at 6).

To counter the holding in *Cinergy I*, Coupled points to the decision by the Indiana Court of Appeals in *Hartford v. Dana Corp*., 690 N.E.2d 285 (Ind.Ct.App. 1997) ("Dana I"). In *Dana I* a manufacturer of automotive components with locations across the United States became subject to numerous environmental contamination actions by the EPA and from third parties for environmental contamination*Dana,* 690 N.E.2d at 287. Sixty-three of Dana's facilities in nineteen states were involved. *Id.* Dana made claims under its CGL insurance policies and was denied coverage. *Id.* Dana then filed suit against fifty-six of the insurance carriers seeking indemnification and defense. *Id.* Ultimately, the court concluded that the insurer was obligated to cover "[t]he cost of containment as a remedial action taken to prevent further release of hazardous substances." *Id.* at 298. Indeed, the Court specifically stated, "[w]e hold that the ordinary meaning of the term 'damages' in a [comprehensive general liability] policy includes EPA or state-mandated cleanup and response costs, and that the trial court properly so concluded." *Id.* at 298. In line with this holding, Coupled asserts that coverage is available to it under the Policies since the actions required in this case are remedial and not preventative.

Having reviewed in detail both the *Cinergy* line of cases as well as the *Dana* line of cases, the Court concludes that neither of these sets of cases are fully informative on the issue before the Court. As a general matter, the Court agrees with Coupled that the impact of the PAO on Coupled is to remediate an *existing* hazardous waste situation, not to bring its facilities into compliance to avoid future harm or non-compliance (although by remediating existing hazardous waste conditions, Coupled will surely also prevent future harm). Thus, the *Cinergy* line of case authorities relied upon by Great American are inapposite to the facts here since that case is

concerned with costs of prevention rather than remediation of an existing environmental contamination situation and, on that basis, the Court DENIES Plaintiff's Motion for Summary Judgment. However, while the *Dana* line of cases endorsed by Coupled seemingly support the position of Coupled, the problem Coupled faces is that it is seeking damages to remediate waste on its own property which may fundamentally misconstrue the nature of its insurance contracts with Great American and ultimately seal its fate. For this reason, the Court requests additional briefing.

First-party insurance policies are agreements between the insurer and the insured (*i.e.*, the "first" party), to protect the insured from its own losses; third-party insurance, by contrast, protects the insured from losses arising from its liability to other ("third") parties. *See* 14 Couch on Insurance § 198:3 (2016). A policy of general liability insurance is customarily known as "third-party insurance." *See* 15–111 Appleman on Insurance Law & Practice Archive § 111.1 (2nd 2011). It is known as "third-party insurance" because the whole purpose of general liability insurance is to provide coverage for liability to third parties. *See*, *e.g.*, 20–129 Appleman on Insurance Law & Practice Archive § 129.1 (2nd 2011) ("The general liability insurance policy originated to provide insurance coverage in order to indemnify an insured against liability due to be paid to others for harm caused by the insured. Since liability insurance is designed to indemnify the insured against liability owing to others, liability coverages were general."); *Bausch & Lomb v. Utica Mutual Insurance Co.,* 625 A.2d 1021, 1033 (1993) ("A hallmark of the comprehensive general liability policy is that it insures against injury *done to a third party's property,* in contradistinction to an 'all-risks' policy also covering losses sustained by the policy-holder.").

This issue of first-party vs. third-party coverage was raised directly for the first time in the Plaintiff's reply brief (albeit in response to an assertion from Coupled that it has suffered "damage"

in the form of a "loss of use" because of a third-party's abandonment of the leased premises leaving behind hazardous waste). Plaintiff asserts that no coverage exists for claims such as this where an insured is not subject to liability to a third-party for the insured's conduct. Coupled is seeking remediation costs through the Policies for "damages" to its own property caused by a third party – not for a liability it incurred to a third-party by its own conduct. The Policies do contain a specific exclusion relating to damages to the insured's property which is mentioned in passing in Great American's brief. Although the Court expresses no opinion presently on whether the exclusion is applicable as the issue has not been fully briefed and presented, Great American asserts the existence of the exclusion language further confirms the general premise that the liability policies are third-party liability policies rather than first-party policies. (See Reply at p. 5 fn. 2)

This said, there is a line of cases in Indiana beginning with *Patz v. St. Paul Fire & Marine Ins. Co.,* 15 F.3d 699, 705 (7th Cir. 1994) suggesting that where an insured is not seeking to recover for damage to their property value but rather to recover the cost of liability imposed on them by a state agency, the owned-property exclusion is obsolete. Indeed, Judge Posner, in *Patz* discussed the issue in this manner:

> St. Paul's alternative ground is that the policy excludes coverage for property damage to property owned by the insured, and to date the only contamination from the waste materials generated by the painting operation is to soil and groundwater within the boundaries of the Patzes' own land. But the Patzes are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.
>
> We do not understand St. Paul to be arguing that the only liability against which the policy insures is liability to pay damages obtained by a lawsuit (or threat of suit) against the insured. St. Paul does argue that its policy stops short of reimbursing an insured for voluntarily undertaking to reduce potential liability, and we agree. The owner of an automobile cannot charge the expense of a fancy new braking system

> to his liability insurer on the ground that the system will make it less likely that he will injure someone in an accident. But the Patzes incurred the clean-up costs for which they seek reimbursement under the policy involuntarily.

*Patz,* 15 F.3d at 705. This holding was reiterated in *Joslyn Manufacturing Co. v. Liberty Mutual Insurance Co.,* 23 F.3d 1212, 1214 n. 1 (7th Cir.1994), in which the Seventh Circuit stated:

> Several of Liberty's arguments address the issue of so-called "owned property." Even if Liberty were not estopped from raising these points, recent caselaw demonstrates that the arguments are without merit. Joslyn is seeking to recover the costs of complying with an Illinois order to clean up contamination, so that the fact that the cleanup occurred on Joslyn's land is irrelevant. *Patz v. St. Paul Fire & Marine Ins. Co.,* 15 F.3d 699, 705 (7th Cir.1994). As explained by the *Patz* court, the plaintiffs there, like Joslyn here, were not seeking to recover for damage to their property but rather to recover the cost of liability imposed on them by a state agency.

*See also, Governmental Interinsurance Exch. v. City of Angola, Ind.,* 8 F. Supp. 2d 1120, 1133 (N.D. Ind. 1998); *Anderson Development Co. v. Travelers Indem. Co.,* 49 F.3d 1128, 1134 (6th Cir.1995); *Savoy Medical Supply Co., Inc. v. F & H Mfg. Corp.,* 776 F.Supp. 703, 709 (E.D.N.Y.1991); *Unigard Mut. Ins. Co. v. McCarty's Inc.,* 756 F.Supp. 1366, 1369 (D.Idaho 1988).

Given the existence of this case law, which has not been addressed by the parties, the Court is hard-pressed to hold on the basis of the current briefing that the Policies exclude coverage for liability to which Coupled is obligated to remediate by IDEM. Accordingly, the Court requests additional briefing or a Renewed Motion for Summary Judgment by Great American wherein it sets forth all the arguments it believes entitles it to a no coverage declaration.

## CONCLUSION

Based on the foregoing, the Plaintiff's Motion for Summary Judgment is DENIED in part as discussed herein. The Court requests additional briefing on the issues discussed above or a Renewed Motion for Summary Judgment setting forth all arguments Plaintiff believes entitles it to summary judgment. Any Renewed Motion for Summary Judgment shall be filed within thirty

(30) days and the normal briefing schedule for dispositive motions shall apply. Otherwise, if no Renewed Motion is forthcoming, the Plaintiff shall have thirty (30) days to present its additional briefing. Coupled shall have fifteen (15) days to respond and Plaintiff shall have seven (7) days to reply.

Entered: This 19th day of July, 2018

s/William C. Lee
United States District Court